******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# F. S. *v.* J. S.*
## (AC 45698)

Alvord, Seeley and Westbrook, Js.

*Syllabus*

The defendant appealed from the judgment of the trial court awarding sole legal and physical custody of the parties' minor child, O, to the plaintiff and imposing certain restrictions on his visitation with O. After the plaintiff initiated the underlying marital dissolution action, the parties filed numerous motions with the court, and, given the volume and nature of the motions, the court ordered that neither party could file any additional motions without first requesting leave from the court, with an exception for ex parte emergency requests approved by the guardian ad litem. The parties thereafter entered into an agreement to dissolve their marriage, which indicated that, although they agreed upon the division of their marital property and debt and the issue of alimony, they had been unable to resolve issues related to custody, access and care of O and that those issues should be resolved by the court in subsequent proceedings after completion of a custody evaluation by S, a clinical psychologist. The court subsequently rendered a judgment of dissolution of marriage that incorporated the parties' agreement. S filed her custody evaluation with the court, and the custody hearing was scheduled to commence in March, 2020, but, due to the COVID-19 pandemic, it did not go forward as scheduled. When the trial ultimately commenced, the court heard testimony from L, a social worker from the Department of Children and Families, over repeated objections by the defendant. L testified that she had investigated an anonymous call made to the department concerning the plaintiff's purported physical removal of O from a baseball game in which he was participating. During L's testimony, a redacted version of the relevant department investigation protocol was admitted into evidence as a full exhibit. L testified that her investigation included, among other things, interviews with O and conversations with G, O's former therapist, and that, as a result of her investigation, the department discovered no concerns with the plaintiff's actions during the baseball game incident or her ability to parent O, but the department did develop concerns about O's emotional well-being with respect to the defendant. L also testified that the department subsequently substantiated emotional neglect of O by the defendant, and, in response to questions from the defendant on cross-examination, that she had reviewed an affidavit sworn to by G and that G's opinion, both as expressed in the affidavit and in interviews, was relied on by the department in its investigation. L's testimony did not disclose the actual contents of G's affidavit. The defendant later attempted to have a copy of G's affidavit admitted into evidence, but the plaintiff objected on hearsay grounds, and it was marked for identification purposes only. Several days into the trial, the defendant made an oral motion for a continuance, arguing that he would not go forward upon medical advice and indicating that, inter alia, his blood pressure that morning was at unacceptable levels and that he was disabled as a result of an auto accident. The court denied the defendant's oral motion, noting that he had filed several motions for continuance within the previous few days citing other reasons, all of which were denied. Later that day, after the defendant provided the court with a letter from his medical provider that indicated that the defendant suffered from angina and asked the court to adjust the trial schedule in an attempt to reduce the defendant's stress, the defendant indicated to the court that his stress was largely due to not having time between hearing dates to eat properly and prepare his case. The defendant did not refer to the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.) or clarify that he was seeking an accommodation under the ADA. The court reconsidered the defendant's oral motion for a continuance, stating on the record that it was going to adjust the court's schedule to accommodate the defendant's health and to reduce his stress, and later issued a written order granting the defendant's motion for continuance and

indicating that the remaining days of trial would continue in half day morning sessions. Approximately ten half day morning sessions were held. Thereafter, the court scheduled additional sessions for alternating full days. The defendant, with permission, filed a motion for a scheduling order in which he argued that the court previously had granted him an ADA accommodation limiting trial dates to half days and stating that the full day trial dates scheduled by the court were contrary to his medical provider's advice and contrary to the existing order of accommodation. The defendant requested that the court reschedule further sessions to half day morning sessions. The court denied the motion for a scheduling order on the record, and the next day the defendant filed a motion in which he indicated that he had filed a grievance with the ADA administrator for the Connecticut Judicial Branch. He asked the court to stay any further full day proceedings until the grievance matter was resolved, although he indicated that he was able to go forward with half day morning sessions pursuant to the original accommodation. The court denied the motion, and, at the next day's hearing, the defendant made an oral motion for a continuance that the court denied without prejudice to the defendant producing documentation from his physician regarding his health status. The defendant informed the court that he was not proceeding with his case and abruptly left the courthouse and did not return. The defendant appeared for the next scheduled court date. Before the lunch recess, the defendant informed the court on the record that he was not going to return to court for a full day trial until the court modified its order. The court informed the parties that the hearing would resume at 2 p.m. unless a written motion for a continuance was filed and granted. The defendant neither filed a motion for a continuance nor appeared for the afternoon session. Several days later, the defendant again appeared for the hearing in the morning but again failed to appear for the afternoon session and did not file a motion for a continuance. On the basis of the defendant's failure to appear, the court determined that the defendant had failed to present his testimony and evidence as set forth in the court's scheduling order, and, therefore, the court determined that the defendant's case was concluded. The court also denied all of the defendant's pending motions with prejudice for failure to present any testimony, evidence, and argument to the court. The plaintiff was permitted to provide rebuttal testimony. In the court's memorandum of decision, it set forth detailed findings with respect to the defendant's behavior generally, his parenting skills, and his difficult relationship with O, which contrasted with the healthy relationship that the court found O had with the plaintiff. The court noted in some detail the defendant's medical diagnosis by two separate doctors of narcissistic personality disorder and his failure to make or maintain any significant progress through treatment. The court ultimately awarded full legal and physical custody of O to the plaintiff. With respect to parenting time, the court ordered that the defendant was entitled to weekly supervised access to O via a third-party therapeutic supervised visitation agency, with the cost paid by the defendant. However, the defendant's parenting access would begin only after the defendant provided proof to the plaintiff and/or her counsel that he had engaged a clinician to address his narcissistic personality disorder, and such proof was required to be updated on a quarterly basis. The court also issued orders limiting the defendant's right to seek modification or expansion of his parenting access. The court further ordered that the defendant could not participate in any of the child's extracurricular and sporting activities until he satisfied the conditions for seeking modification/expansion of the parenting access orders. *Held*:

1. The defendant's claims that the trial court violated his rights under the ADA were unavailing, this court having determined that, even assuming for purposes of argument that the defendant had a disability that entitled him to a reasonable accommodation under the ADA as a matter of procedural due process, he in fact received such accommodation and failed to demonstrate otherwise or to point to any evidence in the record from which it reasonably could be concluded that any of the trial court's adverse actions or rulings in the present matter were the product of retaliatory animus rather than a proper exercise of judicial discretion:

a. The defendant could not prevail on his claim that the trial court improperly refused to provide him with the same medical accommodation granted to him earlier in the trial, as he did not make a formal ADA request prior to his oral motion to the court, and the letter from his

medical provider did not suggest any particular accommodation but only recommended that the court adjust the hearing schedule, which at that time consisted of back-to-back full day hearings, so as to reduce the defendant's stress; moreover, nothing in the language of the court's order limiting the length of the remaining then scheduled hearing dates to half days rendered that accommodation nonmodifiable in the future, and, to the contrary, it could be reasonably inferred from the court's requirement that the defendant keep it apprised of any changes in his medical condition that the accommodation was never intended to be permanent or to bind future courts in the event of a change in relevant circumstances; furthermore, the defendant provided no authority that stands for the proposition that once a public entity has provided an accommodation it is not permitted to adjust it under appropriate circumstances or to provide a substitute accommodation, and, in the present case, when it became clear to the court that continuing with half day sessions would be untenable and interfere with docket management and the fair administration of justice, it was well within the court's discretion to substitute the prior accommodation for one that was equally reasonable, and proceeding with full day hearings on nonconsecutive days still allowed time for the defendant to rest and recover from the prior day's proceedings and reduced the stress of preparing for the next day, which was fully in accord with the recommendation of the defendant's medical provider and was, in fact, the exact accommodation the defendant originally requested.

b. The defendant could not prevail on his claim that the trial court retaliated against him for exercising his rights under the ADA by denying motions and prematurely resting his case; the defendant failed to point to anything in the record that would support his assertion that the trial court's actions were made with discriminatory animus rather than, as reflected in the record, as a response to the defendant's failure to appear, which was a reasonable and nondiscriminatory basis for the court's actions for which the defendant failed to account.

2. The trial court properly considered the defendant's mental health diagnosis as a basis for determining custody and setting conditions regarding visitation: pursuant to the statute (§ 46b-56) governing orders regarding the custody and care of minor children in dissolution actions, one of the factors that a court may consider is the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interest of the child, and, in the present case, the court did not award the plaintiff sole custody of the parties' child solely on the basis of the defendant's mental health diagnosis but, rather, it was but one of a number of reasons provided by the court for its decision and, therefore, was not in and of itself determinative of the court's custody order; moreover, the court's focus was not on the defendant's mental health per se, but, rather, the court identified that it was concerned by the defendant's failure to make reasonable progress to address its harmful effect on his parenting of O; furthermore, the defendant failed to demonstrate that the court made any clearly erroneous factual findings regarding his mental health or to point to anything in the record that would support his assertions that the court's consideration of his mental health diagnosis amounted to retaliation or disability discrimination.

3. The trial court did not abuse its discretion by considering the custody evaluation prepared by S in determining the best interest of O: the court did not rely solely on S's custody evaluation but, rather, it had ample current evidence before it of the defendant's present ability to parent, and, although the court accepted S's evaluation into evidence, it considered and evaluated it in light of the updated testimony from S and others, as well as evidence submitted by both parties regarding the child's and parents' current situations; moreover, although S's custody evaluation may have had some limitations due to the delay of the courts being closed due to COVID-19, this went solely to the weight the trial judge gave the report rather than to its admissibility.

4. The defendant could not prevail on his claim that the trial court improperly required the parties to request leave of the court before filing trial and pretrial motions and improperly denied multiple such requests: although the defendant relied on language from *Ahneman* v. *Ahneman* (243 Conn. 471), in which the Supreme Court held that the trial court lacked the discretion to refuse to rule on certain motions filed by the defendant

in that case, there was nothing in the decision in *Ahneman* curtailing a trial court's exercise of its considerable discretion over its docket or expressly barring the type of prohibitory order issued in the present case, and, to the contrary, the court in *Ahneman* acknowledged that exceptions to the general rule that a trial court must consider and decide on a reasonably prompt basis all motions properly placed before it may exist in an extreme, compelling situation; moreover, several years after the *Ahneman* decision, this court in *Strobel* v. *Strobel* (92 Conn. App. 662) opined that a prohibitory order essentially identical to the one at issue in the present case constituted a praiseworthy attempt by the trial judge to limit the parties' barrages of repetitive and abusive motions, and this court found that the record in the present case reflected no less a compelling reason for an order attempting to curtail the flood of repetitive and oftentimes frivolous motions filed in this matter.

5. The defendant could not prevail on his claim that the trial court improperly awarded sole custody of O to the plaintiff even though the parties had always shared custody and the plaintiff made no showing of a change of circumstances; in the present case, the parties shared legal and physical custody of O until the time of the dissolution of marriage, and whether such joint custody should continue in the future was precisely the issue that the parties could not agree upon in their separation agreement and left for the court in the present action to decide, and, accordingly, the case law cited by the defendant holding that courts lack the authority to modify existing custody orders in the absence of a material change of circumstances was inapposite to the facts of this case.

6. The defendant could not prevail on his claim that the trial court erroneously found that the defendant had narcissistic personality disorder; this court was not left with a definite and firm conviction that any mistake was made with respect to the trial court's challenged findings, as the evidence in the record, including testimony from S and her custody evaluation, adequately supported the court's findings that the defendant had been diagnosed with narcissistic personality disorder and that this diagnosis constituted a long-term pattern of maladaptive behavior that was not amenable to treatment.

7. The defendant could not prevail on his evidentiary claims that the trial court improperly admitted certain testimony of L and improperly admitted and relied on an affidavit of G: on the basis of this court's thorough review of the transcripts of L's testimony and the many objections raised during her testimony by the defendant, this court concluded that the defendant failed to demonstrate how the trial court abused its broad discretion with respect to the admission of L's testimony; moreover, to the extent that the defendant attempted to raise additional objections that were not raised at trial, this court declined to review these unpreserved aspects of his claim, and, with respect to the objections he did raise at trial, this court concluded that the trial court properly ruled on them in the manner that it did for the reasons provided and that further explication by this court was unwarranted; furthermore, there was nothing in the record from which to conclude that the trial court improperly relied on G's affidavit in awarding custody to the plaintiff, as the court never stated in its memorandum of decision that it relied on G's affidavit, which was not in evidence, and the few references to G by the court in its memorandum of decision were incidental and did not reflect any error in the court's reasoning.

Argued November 13, 2023—officially released February 20, 2024

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Prestley, J.*, accepted the parties' stipulation to bifurcate the trial as to the issue of custody; thereafter, the case was tried to the court, *Prestley, J.*; judgment dissolving the marriage and granting certain other relief in accordance with the parties' separation agreement; subsequently, the case was transferred to the Regional Family Trial Docket and the issue of custody was tried to the court, *Nguyen-O'Dowd, J.*; judgment granting sole legal and physical

custody of the parties' minor child to the plaintiff, from which the defendant appealed to this court. *Affirmed.*

*J. S.*, self-represented, the appellant (defendant).

*Dennis Francis O'Toole*, for the appellee (plaintiff).

*Opinion*

WESTBROOK, J. In this marital dissolution action, the defendant, J. S., appeals from the judgment of the trial court awarding the plaintiff, F. S., sole legal and physical custody of the parties' minor child, O. The self-represented defendant claims on appeal that he is entitled to a new custody hearing because the court improperly (1) violated the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq. (2018),[1] by refusing to continue to provide him with a medical accommodation previously granted to him by the court; (2) terminated the defendant's presentation of evidence and denied certain motions in retaliation for his exercising his rights under the ADA; (3) relied on the defendant's mental disability as a basis for awarding custody to the plaintiff and restricting his right to visitation; (4) relied on a stale custody evaluation in determining the best interest of O; (5) required the parties to request leave of the court before filing motions and denied multiple such requests made by the defendant; (6) awarded sole custody of O to the plaintiff despite the fact that the parties previously shared custody and the plaintiff failed to demonstrate any substantial change in circumstances; (7) found that the defendant suffered from narcissistic personality disorder; and (8) committed evidentiary errors by (a) admitting the testimony of a social worker from the Department of Children and Families and (b) admitting and relying on an affidavit of O's former therapist, Damion Grasso. Having carefully reviewed the voluminous record presented,[2] we conclude that the defendant has failed to demonstrate any reversible error. Accordingly, we affirm the judgment of the court.

The record reveals the following facts, which were either found by the court or are undisputed in the record, and procedural history. The plaintiff initiated the underlying marital dissolution action in September, 2016. The parties have one child together, O, who was born in May, 2011. By agreement of the parties, the court issued a number of pendente lite orders at the start of the dissolution proceedings, including appointing Attorney Margaret Bozek as guardian ad litem (GAL) for O; awarding the defendant twice weekly supervised parenting time; and ordering the defendant to pay child support to the plaintiff in the amount of $142 per week. On January 3, 2017, the parties reached a subsequent agreement regarding the defendant's parenting time. The court approved that agreement, which provided the defendant with weekly overnight parenting time and an additional five hours of parenting time on weekends.[3]

Early in the proceedings, the parties also filed numerous motions with the court, the bulk of which were disposed of by the court, *Simon, J.*, on March 3, 2017, following a hearing.[4] Given the volume and nature of

the motions, Judge Simon also ordered that neither party could file any additional motions without first requesting leave from the court, except that the parties could file any ex parte emergency request without leave of the court provided that such request also included an affidavit from the GAL stating that she agreed with the request.

On June 29, 2017, the criminal court in the judicial district of Hartford, geographical area number twelve (G.A. 12), informed the court that the defendant had been arrested and arraigned for violating a protective order involving the plaintiff and that he was being held on a $500,000 bond. That same day, the court issued an order in which it granted the plaintiff temporary sole decision-making authority over O's activities and vacated the then existing visitation order for the defendant, indicating that the defendant's access to O would revert to the court's orders of January 3, 2017.[5] Subsequently, on July 19, 2017, the court suspended the defendant's parenting time due to court-ordered competency evaluations in his pending criminal matters. The court also granted sole temporary legal custody of O to the plaintiff until further order of the court.[6]

On January 19, 2018, in response to motions filed by the defendant, the court, *Olear, J.*, entered an order restoring the defendant's parenting time with O to once a week for ninety minutes through a supervised visitation facility. Additionally, by agreement of the parties, the court ordered them to participate in conflict management therapy with Stephen Humphrey, a clinical psychologist, and to undergo a custody/psychological evaluation with Linda Smith, also a clinical psychologist.

On April 3, 2018, the parties entered into an agreement to dissolve their marriage. The agreement, in relevant part, provided the following: "The parties acknowledge that as of the date hereof, they have been unable to resolve the issues related to custody, access and care of [O]. The issues shall be resolved by subsequent proceedings after completion of the custody evaluation being conducted by Dr. Smith." Although the parties were unable to reach a custody agreement, they agreed upon the division of their marital property and debt and that neither would pay alimony to the other. The court, *Prestley, J.*, rendered a judgment of dissolution of marriage that same day that incorporated the parties' agreement. The court also ordered that the current child support order of $142 per week would remain in effect.

Following a hearing on April 4, 2018, the court, *Olear, J.*, issued an order granting the defendant unsupervised parenting time with O on Thursdays after school. If a Little League practice or game interfered with the Thursday parenting time, the visitation would occur on Monday. The court also granted the GAL's request for permission to withdraw from this matter. The court,

*Hon. Gerard I. Adelman*, judge trial referee, subsequently denied the defendant's motion, which objected to the GAL expenses and sought to remove/replace the GAL. The court ordered the defendant to pay the GAL the sum of $22,286.42.

On June 22, 2018, Judge Olear denied the defendant's request to resume overnight visits with O but granted the defendant additional parenting time on Sundays for two hours. The court also clarified that the previously ordered Thursday parenting time was for two hours.

On October 15, 2018, the defendant sought leave of the court to file several motions. Specifically, he sought to file three motions for contempt in which he alleged that the plaintiff had violated court orders regarding visitation, the nonconsumption of alcohol, and O's participation in youth soccer. The defendant also asked the court for a hearing on previously filed motions that sought orders to restore his custodial rights, to increase visitation time, and to award costs.[7] On December 14, 2018, the defendant filed a largely duplicative motion asking again for permission to file a motion for contempt regarding visitation and a motion seeking an order requiring the parties to undergo drug and alcohol testing. He also requested a scheduling order to hear all of his then outstanding motions. Judge Olear denied both of the defendant's requests for leave to file motions but granted his request for a hearing on his motion seeking an increase in parenting time.

On March 6, 2019, the parties entered into an agreement allowing O to participate in Little League tryouts. Following a hearing on April 5, 2019, the court issued orders that the parties would take O to and from practices and/or games during their respective parenting time. The court increased the defendant's parenting time to Tuesdays and Thursdays starting after school to 5:30 p.m. and moved his Sunday parenting time to Saturdays from 1 p.m. to 4 p.m.

On May 8, 2019, the defendant filed a request for leave to file six motions for contempt and a motion for restoration of custody. The court denied the request for leave without prejudice, indicating that the defendant could "request to have the motions heard at the custody hearing." On July 23, 2019, the defendant filed a request for leave to file four motions for contempt and a motion to restore his parenting time. The next day, he filed another motion for leave to file a motion for contempt. The court, *Nastri, J.*, granted the defendant's motions for leave with respect to the motions for contempt but denied leave to file the motion to restore visitation.

On September 10, 2019, the court ordered the parties to go to the caseflow coordinator to obtain a hearing date for the defendant's pending motions for contempt. The court also granted the defendant permission to file several additional motions, all of which were to be

heard at the custody hearing, which, at the time, was scheduled for December 9, 2019.

On December 6, 2019, Dr. Smith filed her custody evaluation with the court. The December 9, 2019 hearing date was continued by the court, and the matter was transferred to the Regional Family Trial Docket and scheduled for five consecutive hearing dates to commence in March, 2020. The March, 2020 custody hearing, however, did not go forward as scheduled.[8]

In addition to filing a variety of motions and objections directed at discovery, on October 13, 2020, the defendant filed a request asking to have all of his pending motions for contempt heard separately from the custody dispute. The court denied that request on October 26, 2020. The defendant's outstanding motions for contempt and the custody matter were then scheduled for hearing dates to begin on December 14, 2020.

The parties and the plaintiff's counsel appeared virtually on December 14, 2020, for the custody hearing. Neither party, however, had complied with the court's standing orders by filing a witness or exhibit list. Moreover, motions in limine and a motion for protective order remained outstanding, and depositions had not yet been completed. As a result, the court, *Nguyen-O'Dowd, J.*, continued the custody hearing to February, 2021, and issued a scheduling order to resolve all necessary outstanding matters prior to the February hearing.[9]

The custody hearing did not commence in February as scheduled because the court was closed due to inclement weather. On February 16, 2021, the plaintiff sought a further continuance of the custody hearing due to an emergent medical condition of her counsel and related treatment. The court granted the continuance over an objection from the defendant. The defendant then proceeded to file more than thirty separate requests and motions directed toward the plaintiff's alleged violations of court orders.

On March 10, 2021, the defendant filed a notice of intent to file a writ of error, which he filed on April 9, 2021, and later amended on April 21, 2021.[10] This court denied the defendant's motion to expedite that appeal and, on May 26, 2021, issued an order dismissing the amended writ of error for lack of jurisdiction because the defendant was a party to the underlying action; see Practice Book § 72-1 (b) (1); and because there was no appealable final judgment.

The contested custody trial and hearing on the defendant's motions for contempt was rescheduled to commence starting on May 24, 2021. On May 24 and 25, 2021, Judge Nguyen-O'Dowd conducted the trial remotely on Microsoft Teams.[11] The parties then appeared in person on May 26 and 27, June 2 and 3, November 29 and 30, and December 1 and 2, 2021.

On December 3, 2021, the parties were scheduled

for a full day, in person hearing. That morning, the defendant filed a motion seeking reissuance of certain subpoenas and a continuance of the hearing to the afternoon due to a flat tire. The presiding judge, *Diana, J.*, issued an order that the matter, as requested, would resume at 2 p.m. and denied all other relief sought in the motion. The defendant later filed another motion to continue the afternoon session, which the court denied. The defendant did not appear in court at 2 p.m. for the hearing.

The parties next appeared in person for full day hearings on December 6, 7 and 8, 2021. During this time, the defendant filed multiple motions that, if granted, would have further delayed completion of the custody hearing. For example, on December 6, 2021, the defendant, who had chosen to proceed as a self-represented party, filed a motion for a continuance to "consult counsel." Judge Diana denied the motion. On December 7, 2021, the defendant filed a motion for a continuance so he could seek the advice of counsel regarding a motion that he had filed to disqualify Judge Nguyen-O'Dowd. Judge Diana denied that motion on December 8, 2021.

Also on December 8, 2021, the defendant made an oral motion for a continuance, arguing that he would not go forward "upon medical advice." He did not have a medical provider present or a medical letter. Nonetheless, he indicated to the court that his blood pressure that morning was "at unacceptable levels" and that he is "disabled as a result of an auto accident [and] has complications and eye pain from a current hemorrhage of a broken eye socket received as a result of domestic violence." He further argued that the custody proceedings were going "in a reckless pace and marathon session requiring the pro se defendant to burn the candle at both ends." The court denied the defendant's oral motion, noting that the defendant had filed several motions for continuance within the previous few days citing other reasons, all of which were denied. The court indicated, however, that the denial was without prejudice to the defendant producing "written documentation from his physician regarding his health status."

Later that day, the defendant provided the court with a letter from his medical provider that, as described by the court, asked the court to "please adjust this court schedule in an attempt to reduce [the defendant's] stress." The medical provider also indicated in his letter that the defendant suffered from angina. The defendant indicated to the court that his stress was largely due to not having time between hearing dates to eat properly and prepare his case. At no point did the defendant refer to the ADA or clarify that he was seeking an accommodation under the ADA. Judge Diana reconsidered the defendant's oral motion for a continuance,

stating on the record that, "I'm going to adjust the court's schedule to accommodate the gentleman's health to reduce his stress." He later issued the following written order: "The court grants the defendant's oral motion for [a] continuance and shall make accommodations as follows: the remaining days of trial shall continue in half day morning sessions."[12]

The parties appeared in person for half day morning sessions on December 9, 10, 20, 21 and 22, 2021, and January 3, 4, 5 and 6, 2022. The court held a half day remote session on February 9, 2022. Thereafter, the court scheduled additional sessions for alternating full days on February 14, 16 and 18, and March 9 and 15, 2022. The defendant, with permission, filed a motion for a scheduling order in which he argued that Judge Diana previously had granted him an ADA accommodation limiting trial dates to half days and stating that the full day trial dates scheduled by the court were "contrary to the defendant's current doctor's medical advice and contrary to the existing order of accommodation." The defendant requested that the court "reschedul[e] further sessions to half day morning sessions."

The court denied the motion for a scheduling order on the record at the February 14, 2022 hearing.[13] The next day, the defendant filed a motion in which he indicated that he had filed a grievance with the ADA administrator for the Connecticut Judicial Branch. He asked the court to stay any further full day proceedings until the grievance matter was resolved, although he indicated that he was "able to go forward with half day morning sessions as per the original accommodation." The court denied the motion on February 17, 2022.

At the February 18, 2022 hearing, the defendant made an oral motion for a continuance that Judge Nguyen-O'Dowd denied without prejudice to the defendant producing documentation from his physician regarding his health status. The defendant informed the court that he was not proceeding with his case and abruptly left the courthouse and did not return. The defendant appeared for the next scheduled court date on March 9, 2022. Before the lunch recess, the defendant informed the court on the record that he was not going to return to court for a full day trial until Judge Diana modified his December 8, 2021 order. Judge Nguyen-O'Dowd informed the parties that the hearing would resume at 2 p.m. unless a written motion for a continuance was filed and granted. The defendant neither filed a motion for a continuance nor appeared for the afternoon session. On March 15, 2022, the defendant again appeared for the hearing in the morning but, once again, failed to appear for the afternoon session and did not file a motion for a continuance.

On the basis of the defendant's failure to appear, the court determined that the defendant "failed to present

his testimony and evidence as set forth in the court's scheduling order," and, therefore, the court determined that "[t]he defendant's case [was] concluded." Moreover, the court denied all of his pending motions for contempt and motions to disqualify with prejudice for failure to present any testimony, evidence, and argument to the court.[14] The plaintiff was permitted to provide rebuttal testimony. The court ordered the parties to file proposed findings of fact by April 14, 2022.[15] The plaintiff timely complied. The court granted the defendant an extension of time to April 17, 2022, and he filed his statement of proposed findings of facts on April 18, 2022.

On July 15, 2022, the court issued its memorandum of decision regarding custody and disposing of a number of outstanding motions. The court set forth detailed findings with respect to the defendant's behavior generally, his parenting skills, and his difficult relationship with O, which contrasted with the healthy relationship that the court found O has with the plaintiff. The court noted in some detail the defendant's medical diagnosis by two separate doctors of narcissistic personality disorder and his failure to make or maintain any significant progress through treatment. The court stated, in part, that, "throughout the custody dispute, the defendant has been more concerned with proving that an injustice has been committed against him by the plaintiff and the individuals and institutions involved in this case, whether directly or indirectly, than with advocating for an outcome that is in [O's] best interest. . . . The defendant is also a high conflict individual. . . . He is unable to communicate effectively with the plaintiff and others without conflict. His response to any request for compromise is to threaten litigation and exert control over the situation. His pathology for paranoia and conspiracy theories displayed itself at trial when he was adamant in his belief that Dr. Smith accepted a bribe in this case. Aside from this bold accusation, no other evidence was provided to the court on this accusation. In sum, the defendant has displayed no change in his psychological functioning [that] negatively impacts his parenting abilities; he has gained no insight into the obstacles that prevent him from becoming an effective parent; and [he] fails to recognize the need to engage in treatment." The court found that O displayed "significant [negative] behaviors related to his visitation with the defendant" and that, during visits, "the defendant has an inability to display appropriate boundaries."

The court found, moreover, that the defendant had poor parenting skills even when the parties were living together. The court explained: "The defendant modeled his parenting based on a puppy training book. He referred to training puppies like raising [O]. The defendant referred to himself as the alpha and dominant member in the pack as to his relationship with [O]. As

a young child, [O] was afraid of the defendant, often hiding and not wanting to go to him. The defendant would tower over [O] and yell at him and threaten to spank him. Additionally, he would exhibit irrational behavior toward [O]. The defendant wanted to expose [O] to his love for golf. When the defendant went to the golf course, he tied [O] to a stake in the ground. In another incident, [O] had scratches on his skin and the defendant insisted that they were cactus spines caught under the skin and pulled them out. The defendant unnecessarily gave [O] lice treatment. He medicated [O] for pinworm even after medical and school personnel indicated that [O] did not have them. These are but a few of the examples in which the defendant displayed a lack of empathy and irrational behavior related to his interaction with [O].

"The defendant lacks the ability to play an active and positive role in [O's] life. He views [O] as an object to fulfill his needs rather than providing him with love and affection and respecting his feelings. Throughout the defendant's testimony, he described in detail the activities that he engages in with [O]. . . . There was nothing in [his] testimony that these were activities that [O] selected or enjoyed. These activities were selected by the defendant to meet his goals to ensure that [O] obtains a level of academic superiority like the defendant and [O's] adult brother." The court credited the observation of Dr. Smith that, although "usually a parent and child spend time interacting with one another . . . this was not the case with the defendant and [O]. They functioned in parallel and not in interaction. Much of their interaction was separate. [O] would engage in his activities and the defendant in his own talk and activities. [O] made efforts to engage the defendant in an activity of his choice or to talk about a topic he initiated. However, the defendant's response was to ignore [O] or bring [up] a topic that had nothing to do with [O's] statement. This is problematic from a psychological perspective because it will result in the child having a less intimate relationship with his or her parent. In [O's] case, it will limit how much [O] will connect and feel safe with the defendant without receiving this emotional support."

The court concluded: "It would be negligent for the court to allow [O] to continue to be subjected to the defendant's maladaptive behaviors. This protracted custody case has allowed [O] to be continually exposed to the defendant's gaslighting, negative tirades about the plaintiff, oversharing of information and lack of emotional connection and support. [O's] current surroundings while in the defendant's care negatively impact his emotional well-being. The defendant is unable to recognize the real harm that his conduct is causing [O]. Rather, the defendant is more interested in proving that he is right at all costs no matter who is negatively affected, even if [O] is at the center."

With respect to custody, the court ordered as follows: "The plaintiff shall have sole legal and physical custody. The plaintiff shall have sole decision-making authority as to [O's] school, extracurricular activities, sports, camps and medical care to include medical, dental, psychiatric and therapeutic care. The defendant shall not enroll [O] or schedule appointments for [O] in those areas in which the plaintiff has sole decision-making authority. The defendant shall not interfere with [O's] participation and engagement in the areas in which the plaintiff has sole decision-making authority. This shall include contacting, either by written, electronic or in person communication, the providers or organizations to harass them." Neither party was permitted to relocate with O out of state without prior order of the court.

With respect to parenting time, the court ordered that the defendant was entitled to weekly supervised access to O on Wednesdays after school, or at 3 p.m. if there is no school, until 7 p.m., and on alternating Saturdays from 10 a.m. to 2 p.m. A third-party therapeutic supervised visitation agency would be responsible for supervision, with the cost paid by the defendant. The defendant's parenting access was ordered to begin once the defendant provided proof to the plaintiff and/or her counsel that he had engaged a clinician to address his narcissistic personality disorder. Such proof was required to be updated on a quarterly basis. The court also issued orders limiting the defendant's right to seek modification or expansion of his parenting access until a motion for modification has been filed with the court with a request for leave and a showing that he had exercised at least 75 percent of his parenting access and has engaged in regular and consistent treatment for at least one year, including, but not limited to, engaging "a clinician who has the skills and training to address narcissistic personality disorder; consultation with a psychiatrist and neurologist; and group therapy for domestic abuse/trauma." The court further ordered that the defendant could not participate in any of O's extracurricular and sporting activities until he satisfied the conditions for seeking modification/expansion of the parenting access orders. The court issued a number of other orders related to child support, taxes, legal fees and the resolution of certain outstanding motions.

This appeal followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the defendant's claims on appeal, we first set forth our standard of review and other applicable legal principles. "[T]he standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in

domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Our deferential standard of review, however, does not extend to the court's interpretation of and application of the law to the facts. It is axiomatic that a matter of law is entitled to plenary review on appeal." (Internal quotation marks omitted.) *Coleman* v. *Bembridge*, 207 Conn. App. 28, 33–34, 263 A.3d 403 (2021). "As has often been explained, the foundation for [our deferential] standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . ." (Internal quotation marks omitted.) *Buxenbaum* v. *Jones*, 189 Conn. App. 790, 794, 209 A.3d 664 (2019).

Orders regarding the custody and care of minor children in dissolution actions are governed by General Statutes § 46b-56, which grants the court broad discretion in crafting such orders. Subsection (a) of § 46b-56 provides in relevant part that "the court may assign parental responsibility for raising the child to the parents jointly, or may award custody to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. . . ."

"In making . . . any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. *Such orders may include . . . the award of sole custody to one parent with appropriate parenting time for the noncustodial parent where sole custody is in the best interests of the child . . . .*" (Emphasis added.) General Statutes § 46b-56 (b).

"[Section] 46b-56 (c) provides in relevant part that when making custody orders, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of [seventeen enumerated factors]. . . . The court is not required to assign any weight to any of the factors that it considers.[16] In reaching a decision as to what is in the best interests of a child, the court is vested with broad discretion and its ruling will be reversed only upon a showing that some legal principle or right has been violated or that the discretion has been abused." (Footnote added; internal quotation marks omitted.)

*Morrone* v. *Morrone*, 142 Conn. App. 345, 351, 64 A.3d 803 (2013). As our Supreme Court recently reiterated, "[t]he authority to exercise the judicial discretion [authorized by § 46b-56] . . . is not conferred [on] [the state's appellate courts], but [on] the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one [that] discloses a clear abuse of discretion can warrant our interference." (Internal quotation marks omitted.) *Zhou* v. *Zhang*, 334 Conn. 601, 632–33, 223 A.3d 775 (2020); see also *Yontef* v. *Yontef*, 185 Conn. 275, 279, 440 A.2d 899 (1981) ("[i]t is a rare case in which a disappointed litigant will be able to demonstrate abuse of a trial court's broad discretion in [child custody] matters"). With these standards in mind, we turn to the claims on appeal.

I

The defendant's first two claims assert that the trial court violated his rights under the ADA. Specifically, the defendant claims that the court (1) refused to provide him throughout the underlying proceedings with the same medical accommodation first granted to him by Judge Diana and (2) retaliated against him for exercising his ADA rights by denying motions and prematurely resting his case. We conclude that both claims are without merit.

We begin by noting that the defendant has brought both an administrative grievance and an action in federal District Court that raise, inter alia, the same ADA claims now raised in the present appeal. The parties have not raised or briefed whether principles of comity between state and federal courts, the prior pending action doctrine, failure to exhaust administrative remedies or some other justiciability doctrine should militate against our review of the merits of the defendant's claims. The plaintiff has argued that no trial court has made any express findings regarding whether the defendant has a "disability" for purposes of the ADA,[17] and the record is at best ambiguous as to whether the "accommodation" Judge Diana granted the defendant was intended by the court as an ADA accommodation or merely a pragmatic solution to issues raised by the defendant via his oral motion for a continuance. The defendant did not seek an articulation from Judge Diana regarding his order, and it is axiomatic that this court does not make findings of fact; see *Zitnay* v. *Zitnay*, 90 Conn. App. 71, 81, 875 A.2d 583, cert. denied, 276 Conn. 918, 888 A.2d 90 (2005); both of which implicate the adequacy of the record before us.

In any event, we need not resolve any reviewability concern because, even if we were to assume for purposes of argument that the defendant had a disability that entitled him to a reasonable accommodation under

the ADA as a matter of procedural due process, we conclude, for the reasons that follow, that he, in fact, received just that and has failed to demonstrate otherwise. Furthermore, he has failed to direct us to any evidence in the record from which we reasonably could conclude that any of the court's adverse actions or rulings in this matter were the product of retaliatory animus rather than a proper exercise of judicial discretion.

A

The ADA defines a public entity as, inter alia, "(A) any State or local government; [or] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." 42 U.S.C. § 12131 (1) (2018). "For purposes of the ADA, the Connecticut Superior Court is considered to be a public entity." *State* v. *Riddick*, 61 Conn. App. 275, 283 n.5, 763 A.2d 1062, cert. denied, 255 Conn. 946, 769 A.2d 61 (2001). Accordingly, once a court identifies a litigant as having a disability, it should act to provide some reasonable accommodation to allow the litigant to participate in the court proceedings. A court has considerable discretion, however, in choosing the type of accommodation to offer. See id., 283–84; see also *McElwee* v. *Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("[a]lthough a public entity must make reasonable accommodations, it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice" (internal quotation marks omitted)). A party is not entitled to the precise accommodation that he or she requests but only a *reasonable* accommodation. See *Cooling* v. *Torrington*, 221 Conn. App. 567, 584–85, 302 A.3d 319 (2023). Moreover, if a party needs a specific accommodation, then he or she needs to provide enough information to demonstrate why only that accommodation is sufficient. See id., 586.

In the present case, the defendant made an oral request for a continuance in which he argued that he was under stress and needed time between hearing dates to rest and effectively present his case. The defendant did not make a formal ADA request prior to his oral motion to the court either by contacting the court's ADA coordinator or by completing a form requesting accommodations by a person with disabilities that is available on the Judicial Branch website. His medical provider submitted a letter that did not suggest any particular accommodation but only recommended that the court adjust the hearing schedule, which at that time consisted of back-to-back full day hearings, so as to reduce the defendant's stress. Judge Diana, upon review of the recommendation of the defendant's medical provider and having listened to the defendant explain the source and nature of his stress, "adjust[ed] the court's schedule to accommodate the [defendant's] health" by limiting the length of the remaining then

scheduled hearing dates to half days only. Nothing in the language that the court used rendered that accommodation nonmodifiable in the future. To the contrary, the court required the defendant to keep the court apprised of any changes in his medical condition, from which it can be reasonably inferred that the accommodation was never intended to be permanent or to bind future courts in the event of a change in relevant circumstances.

It is axiomatic that a trial court "has a responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interference with the fair administration of justice. . . . In addition, matters involving judicial economy, docket management [and control of] courtroom proceedings . . . are particularly within the province of a trial court. . . . The court inherently holds reasonable control over its schedule." (Citation omitted; internal quotation marks omitted.) *M. B.* v. *S. A.*, 194 Conn. App. 727, 733–34, 222 A.3d 551 (2019). The defendant has provided no authority, nor are we aware of any, that stands for the proposition that once a public entity has provided an accommodation it is not permitted to adjust it under appropriate circumstances or to provide a substitute accommodation.

Here, when it became clear to Judge Nguyen-O'Dowd that continuing with half day sessions would be untenable and interfere with docket management and the fair administration of justice, it was well within the court's discretion to substitute Judge Diana's prior accommodation for one that was equally reasonable. Proceeding with full day hearings on nonconsecutive days still allowed time for the defendant to rest and recover from the prior day's proceedings and reduced the stress of preparing for the next day, which was fully in accord with the recommendation of the defendant's medical provider. In fact, it was the exact accommodation the defendant originally requested from Judge Diana. See footnote 12 of this opinion.

We are unpersuaded that the court conducted the custody hearing in a manner that violated the defendant's rights under the ADA. Accordingly, he is not entitled to a new hearing on that basis.

B

We briefly turn next to the defendant's claim that the court retaliated against him for exercising his rights under the ADA. The record before this court is insufficient to establish that the court took any action against the defendant in retaliation for his exercising his rights under the ADA.

The ADA prohibits retaliation against "any individual because such individual has opposed any act or practice made unlawful by [the ADA] . . . ." 42 U.S.C. § 12203 (a) (2018). To ultimately succeed on a claim of retalia-

tion under the ADA, however, a plaintiff must establish that the alleged retaliatory actions of the defendant would not have occurred "but for" the plaintiff having exercised his ADA rights. See *Natofsky* v. *City of New York*, 921 F.3d 337, 346–50 (2d Cir. 2019). In other words, if the defendant has even one legitimate, nonretaliatory reason for its actions, the plaintiff's claim of retaliation will fail unless the plaintiff produces evidence to rebut the proffered nondiscriminatory reason. See *Ring* v. *Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (defendant was entitled to summary judgment on plaintiff's ADA retaliation claim because plaintiff failed to rebut nondiscriminatory reason proffered by defendant).

In the present case, the defendant asserts that the acts of retaliation by the court are its denial of his motions and the court's resting of his case following his repeated failures to appear. The defendant, however, has not pointed us to anything in the record that would support his assertion that these actions were done with discriminatory animus rather than, as reflected in the record, as a response to the defendant's failure to appear. As aptly argued by the plaintiff, there was a reasonable and nondiscriminatory basis for the court's actions for which the defendant has failed to account, and, therefore, the defendant's claim of discriminatory retaliation under the ADA necessarily fails.

In sum, even if we assume for the sake of argument that the defendant's ADA claims are properly before us and that he had a right to a reasonable accommodation in accordance with the ADA, the defendant has failed to show that he was denied a reasonable accommodation or that the court retaliated against him for asserting his federal statutory rights. For the reasons provided, the defendant's first two claims are without merit.

## II

The defendant next claims that the court improperly relied on the defendant's mental health diagnosis as a basis for limiting his right to visitation and awarding custody to the plaintiff. The plaintiff counters that the court appropriately considered the mental health of the defendant in determining custody and setting conditions regarding visitation. We agree with the plaintiff.

The touchstone of any custody determination is what is in the best interest of the child. General Statutes § 46b-56 (c); *Barros* v. *Barros*, 309 Conn. 499, 517, 72 A.3d 367 (2013). One of the enumerated factors that a court may consider in determining issues of custody and visitation in the context of a divorce is "the mental and physical health of *all* individuals involved, except that a disability of a proposed custodial parent . . . *in and of itself*, shall not be determinative of custody unless the proposed custodial arrangement is *not in the best interests of the child* . . . ." (Emphasis added.)

General Statutes § 46b-56 (c) (13).[18]

In the present case, the court did not award the plaintiff sole custody of O solely on the basis of the defendant's mental health diagnosis. This was but one of a number of reasons provided by the court for its decision and, therefore, was not "in and of itself" determinative of the court's custody order. The defendant has not directed our attention to anything in the record that suggests otherwise or that would support his assertions that the court's consideration of his mental health diagnosis amounted to retaliation or disability discrimination. Moreover, the court's focus was not on the defendant's mental health per se but, rather, the court identified that it was concerned by the defendant's failure to make reasonable progress to address its harmful effect on his parenting of O as set forth in the court's decision. As discussed further in part VI of this opinion, the defendant has failed to demonstrate that the court made any clearly erroneous factual findings regarding his mental health.

It was not improper for the court to rely in part on the defendant's mental health and its effect on the development of O in determining custody. Likewise, it is not the province of this court to reweigh the evidence before the court or to substitute our judgment in this matter. Accordingly, we reject this claim.

### III

The defendant further claims that the court improperly relied on a stale custody evaluation in determining the best interest of O. We are not persuaded.

The parties stipulated in February, 2018, that Dr. Smith would conduct a custody evaluation. This agreement was approved by the court. Dr. Smith completed her evaluation in December, 2019, and filed her report with the court that same month. Although the trial had been set to begin in March, 2020, the court closed around this time due to the COVID-19 pandemic and trials were suspended. The trial in this matter began in May, 2021, and concluded in March, 2022. Dr. Smith's 2019 evaluation was admitted into evidence, and she testified regarding the substance of her evaluation and her findings and recommendations, all of which were subject to cross-examination by the defendant.

It is well settled that in exercising its considerable discretion in assessing a child's best interest and the ability of parents to meet a child's needs related to custody or visitation, "the court . . . may hear the recommendations of professionals in the family relations field . . . ." (Internal quotation marks omitted.) *Merkel* v. *Hill*, 189 Conn. App. 779, 787, 207 A.3d 1115 (2019). Ultimately, however, "the trial court is bound to consider the [child's] *present* best interests and not what would have been in [his or her] best interests at some previous time." (Emphasis in original; internal quota-

tion marks omitted.) Id., 788. Thus, a "court's reliance on outdated information and past parental conduct in making . . . orders concerning [custody or] parental access may be improper, particularly if the record has adequate current information demonstrating a present ability to parent." *Balaska* v. *Balaska*, 130 Conn. App. 510, 518, 25 A.3d 680 (2011).

In the present case, rather than relying solely on the 2019 custody evaluation, the court had ample current evidence before it of the defendant's present ability to parent. Although the court accepted Dr. Smith's evaluation into evidence, it considered and evaluated it in light of the updated testimony from Dr. Smith and others, as well as evidence submitted by both parties regarding O's and the parents' current situations. See id. (court's reliance on outdated report did not constitute abuse of discretion because "there was adequate current information in [the] record to support [the court's] orders"). We agree with the plaintiff's assessment in her brief that, "although the custody evaluation of Dr. Smith may have had some limitations due to the delay of the courts being closed due to COVID-19, this goes solely to the weight the trial judge gives the report rather than its admissibility." Because we are convinced from our review of the record that other, more current evidence introduced at trial amply supports the court's custody determination, the court did not abuse its discretion by considering Dr. Smith's custody evaluation.

IV

The defendant claims next that the court improperly required the parties to request leave of the court before filing trial and pretrial motions and denied multiple such requests. The defendant asserts that the court cited no authority permitting it to limit the parties in this way and suggests that it was the court's requiring the parties to seek permission before filing motions that resulted in "this litigation [becoming] one of the longest running custody matters in state history . . . ." The defendant's claim is unavailing.

In support of his claim, the defendant relies on language from *Ahneman* v. *Ahneman*, 243 Conn. 471, 706 A.2d 960 (1998), in which our Supreme Court held that the trial court lacked the discretion to refuse to rule on certain motions filed by the defendant in that case. See id., 482. The court in *Ahneman* stated that trial courts "are in the business of ruling on litigants' contentions, and they generally operate under the rule essential to the efficient administration of justice, that where a court is vested with jurisdiction over the subject-matter . . . and . . . obtains jurisdiction of the person, it becomes its . . . duty to determine every question which may arise in the cause . . . . This general rule is particularly important in the context of marital dissolution cases because of the likelihood of continuing changes in the parties' circumstances requiring con-

tinuing dispute resolution by the court." (Citation omitted; internal quotation marks omitted.) Id., 484. There is nothing in the *Ahneman* decision, however, curtailing a trial court's exercise of its considerable discretion over its docket or expressly barring the type of prohibitory order issued by Judge Simon in the present case. To the contrary, the court in *Ahneman* acknowledged that "exceptions to the general rule that a trial court must consider and decide on a reasonably prompt basis all motions properly placed before it may exist in an extreme, compelling situation. For example, we do not rule out the possibility that a trial court may have discretion *to refuse to entertain or decide motions in order to prevent harassing or vexatious litigation. . . .* Likewise, there may be other circumstances in which a trial court properly could refuse to consider certain motions." (Citations omitted; emphasis added.) Id., 484–85.

Several years after the *Ahneman* decision, this court, in *Strobel* v. *Strobel*, 92 Conn. App. 662, 886 A.2d 865 (2005), opined that a prohibitory order essentially identical to the one rendered by Judge Simon in the present case;[19] see id., 663; constituted a "praiseworthy" attempt by the trial judge to limit the parties' "barrages of repetitive and abusive motions in an apparently ceaseless war of hostility and vindictiveness toward one another and that those motions are not only abusive to the system but, more importantly, to their now teenage son." Id., 665. The record in the present case reflects no less of a compelling reason for an order attempting to curtail the flood of repetitive and oftentimes frivolous motions filed in this matter. Accordingly, we reject the defendant's claim.

V

The defendant claims that the court improperly awarded sole custody of O to the plaintiff even though the parties had always shared custody and the plaintiff made no "showing of a change of circumstance." We are not persuaded.

In making this claim, the defendant cites case law holding that courts lack the authority to modify existing custody orders in the absence of a material change of circumstances. See *Hall* v. *Hall*, 186 Conn. 118, 122, 439 A.2d 447 (1982) (noting that after *final* decree dissolving marriage enters, our Supreme Court "has limited the broad discretion given the trial court to modify custody orders under . . . § 46b-56 by requiring that modification of a custody award be based upon either a material change of circumstances [that] alters the court's finding of the best interests of the child . . . or a finding that the custody order sought to be modified was not based upon the best interests of the child" (citations omitted)).

Here, up until the time of the dissolution of marriage,

the parties shared legal and physical custody of O. Whether such joint custody should continue in the future, however, was precisely the issue that the parties could not agree upon in their separation agreement and left for the court in the present action to decide. Custody had not been finally determined. The cases relied on by the defendant addressing the court's authority to modify a prior custody order are inapposite to the facts before us. Accordingly, the defendant's claim asserting an improper modification of custody fails.

## VI

The defendant next claims that the court erroneously found that the defendant had narcissistic personality disorder. Because there was evidence in the record to support this finding, and we lack a definite and firm conviction that a mistake was made, the defendant's claim fails.

Whether the defendant suffered from a particular medical condition is a factual determination that we review under our clearly erroneous standard of review. See *Malpeso* v. *Malpeso*, 189 Conn. App. 486, 505, 207 A.3d 1085 (2019). As previously stated, "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Coleman* v. *Bembridge*, supra, 207 Conn. App. 34.

Here, the court heard testimony from Dr. Smith that she administered several psychological tests to the defendant in the course of conducting her custody evaluation, including one in which he tested high on the narcissistic personality scale. Dr. Smith was asked during direct examination whether it was her opinion at the time she prepared her report that the defendant "has narcissistic personality disorder?" She responded: "I believe that was my clinical opinion." She was further asked whether it was "typically a temporary condition" if an individual presented with a high score on the narcissism scale. She responded: "So, narcissism and any personality disorder generally tend to be a *long- term pattern* of enduring traits, symptoms and behaviors, typically *not amenable to significant change*, especially if there isn't significant, meaningful treatment." (Emphasis added.) This testimony was consistent with observations made by Dr. Smith in her custody evaluation, in which she had determined on the basis of multiple sources of information, including her own testing and clinical observations, that the defendant suffers from "very high levels of narcissism/narcissistic personality disorder." Dr. Smith also noted in her evaluation that the defendant's own personal therapist, Robert Fogel, with whom she had consulted, previously diagnosed the defendant with narcissistic personality disor-

der and had shared this diagnosis with the defendant. Fogel, who testified at the custody hearing for the defendant, confirmed that he had informed Dr. Smith that he had diagnosed the defendant with narcissistic personality disorder.

The evidence in the record adequately supports the court's findings that the defendant has been diagnosed with narcissistic personality disorder and that this diagnosis constituted a "long-term pattern of maladaptive behavior that is not amenable to treatment." We are not left with a definite and firm conviction that any mistake has been made with respect to the court's challenged findings. Accordingly, we reject the defendant's claim that the court's findings were clearly erroneous.

## VII

Finally, the defendant claims that the court committed the following evidentiary errors: (1) improperly admitting certain testimony of Lineth Santos, a social worker from the Department of Children and Families (department), and (2) improperly admitting and relying on an affidavit of Dr. Grasso, O's therapist. We reject the defendant's evidentiary claims.

The following additional procedural history is relevant to the defendant's claims. At trial, over repeated and often duplicative objections by the defendant,[20] the court heard testimony from Santos, who was called as a witness by the plaintiff. Santos testified that she had investigated an anonymous call made to the department concerning the plaintiff's purported physical removal of O from a baseball game in which he was participating. During her testimony, a redacted version of the relevant department investigation protocol was admitted into evidence as a full exhibit. Santos testified that her investigation included, among other things, interviews with O and conversations with Dr. Grasso. Santos testified that, as a result of her investigation, the department discovered no concerns with the plaintiff's actions vis-à-vis the baseball game incident or her ability to parent O, but the department did develop concerns about O's emotional well-being with respect to the defendant. Santos testified that the department subsequently substantiated emotional neglect of O by the defendant. Santos testified in response to questions from the defendant on cross-examination that she had reviewed an affidavit sworn to by Dr. Grasso[21] and that Dr. Grasso's opinion, both as expressed in the affidavit and in interviews, was relied on by the department in its investigation. Santos, however, never testified in a manner that disclosed the actual contents of Dr. Grasso's affidavit. The defendant later attempted to have a copy of Dr. Grasso's affidavit admitted into evidence, but the plaintiff objected on hearsay grounds, and it was marked for identification purposes only.

It is axiomatic that a "trial court's ruling on the admis-

sibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *Seder* v. *Errato*, 211 Conn. App. 167, 177, 272 A.3d 252, cert. denied, 343 Conn. 917, 274 A.3d 868 (2022). Moreover, "[i]t is well established that this court will not review unpreserved evidentiary claims." *Braham* v. *Commissioner of Correction*, 132 Conn. App. 57, 61, 31 A.3d 71 (2011), cert. denied, 303 Conn. 939, 37 A.3d 153 (2012).

We have thoroughly reviewed the transcripts of Santos' testimony as well as the many objections raised during her testimony by the defendant. We conclude that the defendant has failed to demonstrate how the court abused its broad discretion with respect to the admission of Santos' testimony. To the extent that the defendant has attempted to raise additional objections that were not raised at trial, we decline to review these unpreserved aspects of his claim. With respect to the objections he did raise at trial, we conclude that the court properly ruled on them in the manner that it did for the reasons provided and that further explication by this court is unwarranted.

Furthermore, there is also nothing in the record from which to conclude that the court improperly relied on Dr. Grasso's affidavit in awarding custody to the plaintiff. The court never stated in its memorandum of decision that it relied on Dr. Grasso's affidavit, which, as we have indicated and the defendant agrees, was not in evidence. The few references to Dr. Grasso by the court in its memorandum of decision are incidental and do not reflect any error in the court's reasoning. This aspect of the defendant's evidentiary claim, therefore, also fails.

In summary, having carefully reviewed the record, the transcripts provided, the parties' briefs, oral argument, and all relevant law, we conclude that the defendant has failed to demonstrate any error by the court that warrants a remand for a new trial in this matter. Accordingly, we affirm the judgment of the court.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to use the parties' full names or to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[1] The ADA provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a

public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2018).

[2] This case has been pending for more than seven years, and the docket sheet contains well over one thousand entries.

[3] Originally, the defendant would have parenting time with O beginning after school on Wednesdays and return him to school on Thursdays. On April 19, 2017, the court modified the defendant's parenting time to accommodate the defendant's request that O be permitted to play Little League baseball. Pursuant to the new order, the defendant's weekly overnights would occur on whichever day that O had a game, and the weekend visit was moved from Sundays to Saturdays.

[4] The defendant filed the overwhelming majority of these motions, a practice that continued throughout the underlying proceedings.

[5] The court indicated in its order that the defendant's most recent arrest was the seventh criminal case pending against him in G.A. 12.

[6] As stated by the court in the underlying memorandum of decision, "[i]t was not until October 21, 2020, when the court, *Connors, J.*, acting upon the defendant's motion for clarification (#438), vacated the prior order for temporary sole legal custody to the plaintiff (#438.10). The court . . . restored joint legal custody to the parties with the plaintiff having final decision-making for summer camp and therapy issues."

[7] In the memorandum of decision underlying this appeal, the court stated that throughout the proceedings, rather than allowing matters to be scheduled by the court, it was customary for the defendant to inundate the court and the plaintiff with multiple, often duplicative, filings. This observation is borne out by our own review of the record.

[8] The defendant continued to file numerous requests and motions with the court throughout 2020. On January 21, 2020, the court, *Connors, J.*, denied requests by the defendant to file motions regarding the scheduling of a new hearing date to address his pending contempt motions and motions regarding O's participation in Little League that spring, a holiday visitation schedule, and increased parenting time. On July 8, 2020, the defendant filed an application for a restraining order alleging that he was in immediate physical danger and harm because the plaintiff had allowed O to participate in summer camp, increasing O's exposure to COVID-19 and, therefore, his own. That application was denied following a contested hearing on July 22 and 28, 2020. On August 24, 2020, Judge Connors granted the defendant's request for leave to file a motion for order to determine what elementary school O would attend in the fall of 2020. On August 31, 2020, the court, *M. Murphy, J.*, denied the motion for order. On September 9, 2020, the defendant filed a request for leave to file a motion regarding O's participation in fall Little League. The court, *Connors, J.*, denied that request.

[9] In January, 2021, the defendant filed a request for leave to file a motion for clarification as to the court's January 19, 2018 order regarding payments to the custody evaluator. The request was granted, and the court, *Olear, J.*, clarified its orders, explaining that the parties' oral agreement was that the defendant was solely responsible for the $10,000 retainer to Dr. Smith and the $4000 owed to Dr. Humphrey.

[10] According to his appeal form, the defendant sought review of the trial court's refusal to timely schedule and hear fifty-three pending motions for contempt filed from 2017 to 2021; its denial of a motion in limine regarding the December 6, 2019 custody evaluation; and its refusal to restore his visitation rights.

[11] Although no transcript of the May 25, 2021 hearing was filed with this court, it is clear from the record that there was a remote hearing on that day.

[12] The court had the following colloquy with the defendant:

"The Court: So how can . . . a change in the trial schedule reduce your stress? . . . Do you want half days, not full days?

"[The Defendant]: At this point in time, Your Honor, I think I need a rest.

"The Court: How long do you need a rest?

"[The Defendant]: Well, at least for the balance of the week. And I think I can continue into next week *every other day*. . . .

"The Court: [T]hat's the problem. The court's schedule is set through March where all of our schedules are already determined because people have to have notice of when they have their other trials. So, I can't just say that you can have next week, every other day. You understand?" (Emphasis added.)

[13] The defendant did not order transcripts for the proceedings on February 16, 2022.

[14] The defendant filed an appeal from the court's order, which this court

later dismissed on June 21, 2022, for failure to comply with an order to file preliminary paperwork. See Practice Book § 63-4 (a) and (c).

[15] In the interim, the defendant filed a civil rights complaint with the United States Department of Justice and initiated a civil rights action against Judge Nguyen-O'Dowd in federal District Court, arguing that the court had violated his rights under the ADA.

[16] General Statutes § 46b-56 (c) provides: "In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so, may consider, but shall not be limited to, one or more of the following factors: (1) The physical and emotional safety of the child; (2) the temperament and developmental needs of the child; (3) the capacity and the disposition of the parents to understand and meet the needs of the child; (4) any relevant and material information obtained from the child, including the informed preferences of the child; (5) the wishes of the child's parents as to custody; (6) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (7) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (8) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (9) the ability of each parent to be actively involved in the life of the child; (10) the child's adjustment to his or her home, school and community environments; (11) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (12) the stability of the child's existing or proposed residences, or both; (13) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (14) the child's cultural background; (15) the effect on the child of the actions of an abuser, if any domestic violence, as defined in section 46b-1, has occurred between the parents or between a parent and another individual or the child; (16) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (17) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision."

[17] As used in the ADA, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 42 U.S.C. § 12102 (1) (A) (2018). There is undisputed evidence in the present case that the defendant had coronary artery disease and suffered related angina attacks. The court made no factual determination, however, whether his conditions *substantially* affected or limited major life activities, which the ADA states "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102 (2) (A) (2018); see also *Aucutt* v. *Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1318 (8th Cir. 1996) (affirming District Court's holding that, although it was undisputed that plaintiff suffered from "angina, high blood pressure, and coronary artery disease," plaintiff was not "disabled" within meaning of ADA because "he had presented no evidence suggesting that his medical problems 'substantially limit[ed]' one or more of his 'major life activities' ").

[18] In the context of child protection proceedings, courts have recognized on a fact-specific basis that it may not be in the best interest of a child to be in the custody of a parent who has a mental deficiency or illness, where such illness renders the parent unable to provide the child with necessary care. See, e.g., *In re Antony B.*, 54 Conn. App. 463, 473, 735 A.2d 893 (1999). This is no less the case when considering custody in the context of a marital dissolution action.

[19] The trial judge in *Strobel* ordered: "Neither parent shall file any motions or pleadings without prior approval of the court." (Internal quotation marks omitted.) *Strobel* v. *Strobel*, supra, 92 Conn. App. 663.

[20] The defendant filed a motion in limine to preclude the testimony of any

and all department officials in this matter. The court denied this blanket request without prejudice to the defendant's right to raise any specific objections at trial with respect to issues concerning privilege or confidentiality. When Santos was called to testify, the defendant renewed his request to preclude her testimony, which the court also denied.

[21] We note that, on July 7, 2021, the plaintiff filed in the present action an application for an emergency ex parte order of custody. Attached as an exhibit in support of the application was an affidavit of the plaintiff asserting that the defendant had "engaged in a pattern of alarming behavior that is erratic, disturbing, delusional, and dangerous for [O]." The application stated that an affidavit of Dr. Grasso also was attached, although that affidavit is not part of the application as it appears in the trial court file. In any event, the court, *Nguyen-O'Dowd, J.*, denied the application without comment on July 8, 2021.

———————————————